### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CALLAWAY GOLF COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 09-131-SLR |
| v. | ) | |
| | ) | |
| ACUSHNET COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### ACUSHNET COMPANY'S ANSWER AND COUNTERCLAIM TO CALLAWAY'S COMPLAINT AND DEMAND FOR JURY TRIAL

Acushnet Company ("Acushnet"), files this Answer and Counterclaim in response to the Complaint and Demand for Jury Trial ("Complaint") of Callaway Golf Company ("Callaway"), and states in numbered paragraphs corresponding to the numbered paragraphs of the Complaint, as follows:

### PARTIES

1.    Callaway Golf is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Carlsbad, California.

ANSWER:  Acushnet lacks information sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies them.

2.    Callaway Golf is the parent company of Callaway Golf Ball Operations formerly known as The Top-Flite Golf Company ("Top-Flite"), which is a wholly-owned subsidiary of Callaway Golf and a corporation organized and existing under the laws of the State of Delaware, having a principal place of business in Chicopee, Massachusetts.

ANSWER:  Acushnet lacks information sufficient to form a belief as to the truth of the allegations in paragraph 2 and therefore denies them.

3.      Defendant Acushnet Company ("Acushnet") is a corporation
        organized and existing under the laws of the State of Delaware, having
        a principal place of business in Fairhaven, Massachusetts.

ANSWER: Acushnet admits the allegations in paragraph 3.

4.      Acushnet is a wholly-owned operating company of Fortune Brands,
        Inc. ("Fortune Brands").

ANSWER: Acushnet admits the allegations in paragraph 4.

5.      Fortune Brands, upon information and belief, is a publicly-traded
        corporation organized and existing under the laws of the State of
        Delaware, having a principal place of business in Deerfield, Illinois.

ANSWER: Acushnet admits the allegations in paragraph 5.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and
        1338(a).

ANSWER: Acushnet admits that plaintiff purports to invoke the jurisdiction of this Court under

Section 1331 and 1338(a) of Title 28 of the United States Code.

7.      Acushnet is subject to personal jurisdiction in this District because,
        upon information and belief, Acushnet is a Delaware corporation and
        is doing and has done substantial business in this District, including
        business relating to the sale and distribution for sale of the infringing
        products as described below.

ANSWER: Acushnet admits that it is subject to personal jurisdiction in this District, and that

Acushnet is a Delaware corporation and is doing and has done business in this District, including

business related to the sale and distribution for sale of golf balls, otherwise the allegations of

paragraph 7 are denied.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. §
        1400(b).

ANSWER: Acushnet admits the allegations in paragraph 8.

9.     Callaway Golf is the owner, by assignment, of United States Patent
       Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873 (the "'293, '156,
       '130 and '873 patents" respectively, or the "Sullivan I patents").

ANSWER:  Acushnet admits that assignments for the '293, '156, '130, and '873 patents were

recorded by the United States Patent and Trademark Office on September 26, 2003 and that

Callaway Golf asserts that Callaway Golf is the owner by assignment of the '293, '156, '130,

and '873 patents; otherwise Acushnet is without information or knowledge sufficient to form a

belief as to the truth of the remaining allegations in paragraph 9 and therefore denies the same.

10.     Callaway Golf is the owner, by assignment, of United States Patent
        Nos. 6,495,633 and 6,623,381 (the "'633 and '381 patents"
        respectively, or the "Sullivan II patents").

ANSWER:  Acushnet admits that assignments for the '633 and '381 patents were recorded by

the United States Patent and Trademark Office on September 26, 2003 and that Callaway Golf

asserts that Callaway Golf is the owner by assignment of the '633 and '381 patents; otherwise

Acushnet is without information or knowledge sufficient to form a belief as to the truth of the

remaining allegations in paragraph 10 and therefore denies the same.

## RELEVANT BACKGROUND

11.     Callaway Golf is a direct competitor of Acushnet in the sale and
        distribution for sale of golf products, including but not limited to golf
        balls in this district, throughout the United States, and throughout the
        world.

ANSWER:  Acushnet admits that Callaway and Acushnet sell and distribute golf products,

including golf balls, in this district, throughout the United States and outside the United States;

otherwise denied.

12.     In 2003, Callaway Golf acquired the intellectual property assets of
        Top-Flite's predecessor-in-interest, then also known as "The Top-Flite
        Golf Company," and before that as "Spalding Sports Worldwide, Inc."
        ("Spalding").  Spalding had also been a direct competitor of Acushnet
        with respect to golf products, including golf balls.  For many years

3

Spalding was the number two manufacturer of golf balls based on units sold and a vigorous competitor against Acushnet.

ANSWER: Acushnet admits that Spalding manufactured and sold golf balls and that Callaway Golf bought intellectual property from the bankruptcy estate of Spalding. Acushnet is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 12 and therefore denies same.

13.    Golf ball manufacturers had for years sought the "Holy Grail" of golf balls – a golf ball that had, among other things, both long distance off the tee as well as good feel and spin around the greens.

ANSWER: Denied.

14.    Among the assets Callaway Golf acquired from Spalding was a family of patents that cover a unique blend of materials and properties for high performance golf balls (collectively "the Sullivan patents," including the Sullivan I and Sullivan II patents).

ANSWER: Acushnet admits that the Sullivan I and Sullivan II patents were purchased from the bankruptcy estate of Spalding; otherwise denied.

15.    The Sullivan patents disclose technological breakthroughs relating to golf ball construction, particularly the use of a thin, soft polyurethane outer cover on an ionomer-based multi-layer solid-core golf ball. The technology disclosed in the Sullivan patents revolutionized the game of golf. Golf balls embodying this technology enjoy superior performance that had previously eluded the industry and are considered the long-sought Holy Grail of golf balls based on numerous measures, including sales, use by professionals, and critical acclaim amongst the golf media.

ANSWER: Denied. Acushnet further answers that the United States Patent and Trademark Office, in reexamination proceedings, has issued rejections of each and every claim of the Sullivan I patents under 35 U.S.C. §§ 102 and 103, as being invalid in light of several prior art patents. The PTO has further issued final office actions rejecting all claims and has closed prosecution. Seven PTO examiners (two primary and five conferees) have agreed that the

Sullivan I patents should never have issued.  Furthermore, Acushnet has filed reexamination on

the Sullivan II patents, which are currently pending.

    16.    Within two years of the introduction of golf balls embodying the
Sullivan patents, the vast majority of professional golfers on the PGA
Tour, and other tours, had switched from traditional wound golf ball
constructions – which had been predominantly used by professionals
for many decades – to those incorporating the new Sullivan
technology.  Some commentators noted that the technology in the
Sullivan patents has done more to change the game of golf than any
other equipment advance in the history of the game.

ANSWER: Denied.  The first commercial golf ball embodying any of the Sullivan patents was a

Spalding ball called the Top Flite Strata.  It did not have a polyurethane cover and very few

professional golfers on the PGA Tour switched from wound technology to its technology

following its introduction.

    17.    Golf balls utilizing the patented technology offer superior
performance, including longer distance off the tee, better feel and spin
around the green, and improved durability, compared to prior art golf
balls.

ANSWER: Denied.

    18.    Callaway Golf and Top-Flite have both had success selling golf balls
which embody the fundamental golf ball construction taught in the
Sullivan patents, including the Callaway Golf Rule 35®, CTU 30, HX®
series, and Tour i® series of golf balls, as well as the Ben Hogan® line
of golf balls, among others.

ANSWER: Acushnet admits that the above mentioned balls were offered in the market.

Acushnet is without information or knowledge sufficient to form a belief as to the truth of the

remaining allegations in paragraph 18 and therefore denies same.

    19.    When the Callaway Golf Rule 35 golf ball was first released in 2000, it
made a "big splash," by being the winning ball in one of the first
professional golf tournaments in 2000.

ANSWER: Acushnet admits that at least two different models of the Callaway Golf Rule 35 golf ball were released in 2000. Acushnet is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 19 and therefore denies same.

20.     Players under contract with another golf ball company, including all those players under contract with Acushnet/Titleist at the time, were not at liberty to play the Rule 35 ball when it was released in early 2000, unless they were willing to break their contractual relationship and switch.

ANSWER: Denied. Acushnet further answers that a significant number of tour players were not contractually obligated to play any ball and many other tour players had contracts that expired annually, and therefore Callaway had ample opportunity to sign players. In fact, the number one player in the world switched from a wound ball to a Nike solid ball in May of 2000.

21.     Acushnet makes golf balls under the Titleist® brand, among others. Acushnet sells Titleist brand golf balls in this district, throughout the rest of the United States and throughout much of the world.

ANSWER: Acushnet admits the allegations in paragraph 21.

22.     Acushnet's Titleist brand is referred to by Acushnet in its advertisements, publications and other publicly available information as "The #1 ball in golf."

ANSWER: Acushnet admits that it is the owner of the trademark "Titleist The #1 Ball in Golf," and has used that trademark in selling its Titleist brand golf balls. Acushnet sought registration of this trademark in 1988 and has been using it in connection with the sale of Titleist golf balls for over 15 years.

23.     On information and belief, Acushnet has used the slogan "The #1 ball in golf" to promote its full range of Titleist brand golf balls for at least two decades, due in part to the number of golf tour professionals and other golf professionals who use and/or play with Titleist golf ball products. On information and belief, Acushnet's Titleist branded balls are currently the leading golf balls for professional use, having the highest percentage of golf balls played on tour both worldwide and in the United States.

ANSWER:  Acushnet admits the allegations in paragraph 23.

24.     On information and belief, Acushnet's ability to maintain golf tour
        professionals and other golf professionals playing its Titleist golf ball
        products is directly related to Acushnet's ability to offer those tour
        professionals golf ball products that offer at least similar performance
        characteristics as competitors' best balls in the marketplace.  If
        Acushnet cannot offer golf ball products that perform like a
        competitor's golf ball products, including Callaway Golf's golf ball
        products, then golf professionals will not renew their contracts with
        Acushnet to use or play Acushnet's golf ball products, including the
        Titleist brand of golf balls.  Professional golfers will not play a ball
        which puts them at a competitive disadvantage.

ANSWER:  Denied.

25.     On information and belief, Acushnet uses its high share of golf tour
        professionals and other golf professionals playing its Titleist golf ball
        products to maintain its share of sales in the overall golf ball market
        both in the United States and abroad, through what Titleist calls "the
        pyramid of influence."  The pyramid of influence is a marketing
        strategy premised upon the assumption that the equipment choices of
        professional golfers influence the purchasing decisions of club
        professionals, avid golfers, recreational golfers, and, of course,
        beginner golfers who form the base of the pyramid of influence.

ANSWER:  Acushnet admits that it makes use of a marketing model referred to as the "pyramid

of influence."  Acushnet admits that in general, and subject to many exceptions, equipment

choices of more skilled players can and do influence less skilled players.  Otherwise the

allegations in paragraph 25 are denied as stated.

26.     Prior to October 2000, the vast majority of tour professional golfers,
        including those playing a Titleist golf ball product, were playing a
        "wound" ball like the Titleist Professional or Tour Prestige.

ANSWER:  Acushnet is without information or knowledge sufficient to form a belief as to the

truth of the allegations in paragraph 26 and therefore denies same.

27.     On information and belief, in response to Callaway Golf's launch of
        the Rule 35 golf ball, Acushnet quickly scrambled to release golf ball
        products of similar construction.  Indeed, according to at least one

industry executive, "Titleist officials were particularly impressed with the new Callaway Golf Rule 35 golf ball, and they told the research and development team [at Acushnet/Titleist] to come up with something better in very short order."

ANSWER: Denied.

28.    In October 2000, Acushnet rushed the release of the Titleist Pro V1®
to tour professionals in direct response to the Callaway Golf Rule 35 golf ball. By offering the Pro V1 golf ball to tour professionals, Acushnet was able to keep the majority of its contract tour professionals, preventing those players from switching to a competitive ball, like the Callaway Golf Rule 35 golf ball.

ANSWER: Denied.

29.    According to Acushnet, forty-seven players switched from a Titleist wound ball to the Pro V1 in the first week it was introduced to tour professionals. Had the Pro V1 golf ball not been offered to them, some of those tour professionals would have switched to the Callaway Golf Rule 35 golf ball.

ANSWER: Acushnet admits the first sentence of this paragraph; otherwise denied.

30.    Based on the success of the Titleist Pro V1 with tour professionals, Acushnet subsequently accelerated its commercial launch of the Pro V1 and introduced the Titleist Pro V1x™, and Titleist Pro V1 *™ (collectively "the Pro V1 balls").

ANSWER: Denied as stated.

31.    After the introduction of the Pro V1 balls, Acushnet's U.S. market share increased from 44.5% in 1999 to approximately 50.7% in 2006 despite the entry of other golf companies offering premium golf balls including Callaway Golf, Nike Golf, TaylorMade-Adidas Golf, and others. Based on publicly available data Callaway Golf is informed and believes that Acushnet has sold almost $2 billion worth of Pro V1 balls and that Acushnet continues to sell Pro V1 balls at a rate in excess of approximately $300 million per year.

ANSWER: Acushnet admits that it has sold nearly $2 billion worth of Pro V1 balls. Acushnet is

without information or knowledge sufficient to form a belief as to the truth of the remaining

allegations in paragraph 31 and therefore denies same.

8

32.　　Acushnet touts the Pro V1 balls as the best selling golf balls of all time.

ANSWER:　Denied as stated.

33.　　Wally Uihlein, Acushnet's chairman and CEO, has publicly stated that "the Pro V1 saved the company."

ANSWER:　Acushnet admits that Wally Uihlein has been reported in a news article as stating

that "the Pro V1 saved the company."

## PRIOR LITIGATION

34.　　In prior litigation, Titleist admitted in this Court that all of its Pro V1 golf balls sold from 2000 to September 2008 infringed the technology claimed in the Sullivan I patents.

ANSWER:　Denied.

35.　　The prior litigation began after an extensive mediation process required by a settlement agreement between the parties. On February 9, 2006 Callaway Golf filed the prior suit here in the District of Delaware, *Callaway Golf Company v. Acushnet Company*, C.A. No. 06-091 (SLR), accusing Acushnet's line of Titleist Pro V1 golf balls of patent infringement.

ANSWER:　Acushnet admits that Callaway filed suit against Acushnet in this Court on February

9, 2006, that that lawsuit was styled *Callaway Golf Company v. Acushnet Company,* C.A. No.

06-091 (SLR), and that Callaway accused certain of Acushnet's Pro V1 line of golf balls of

patent infringement in that lawsuit.  Otherwise, Acushnet denies the allegations in paragraph 35.

36.　　Specifically, in the prior case, Callaway Golf asserted that Acushnet's Pro V1 family of golf balls, including the Pro V1 and Pro V1x lines, infringed the Sullivan I patents.

ANSWER:　Acushnet admits that Callaway asserted that Acushnet's Pro V1 family of golf balls,

as it existed at that time, including the Pro V1 and Pro V1x lines, infringed United States Patent

Nos. 6,210,293, 6,503,156, 6,506,130 and 6,595,873.  Otherwise, Acushnet denies the

allegations in paragraph 36.

9

37.   On December 3, 2007, the eve of trial, Acushnet made the admission
      that its line of Pro V1 and Pro V1x golf balls infringed the asserted
      claims of the Sullivan I patents.

ANSWER: Acushnet admits that to simplify the trial and focus it on invalidity issues, Acushnet

made a stipulation regarding infringement of certain claims of U.S. Patent Nos. 6,210,293;

6,503,156; 6,506,130; and 6,595,873. Otherwise, Acushnet denies the allegations in paragraph

37.

38.   A jury trial then followed.  On December 14, 2007, the jury found that
      eight of the nine asserted claims from the Sullivan I patents were valid,
      thereby making Acushnet liable for its patent infringement.  The Court
      entered judgment against Acushnet on December 20, 2007.

ANSWER: Acushnet admits that on December 14, 2007, the jury rendered an inconsistent

verdict, that found eight of the nine asserted claims from the patents-in-suit were not invalid and

found one of the claims was proven invalid.  Acushnet further admits that the Court entered

judgment on December 20, 2007.  Acushnet denies the remaining allegations in paragraph 38.

39.   Following the jury verdict in Callaway Golf's favor, Callaway Golf
      filed a motion seeking a permanent injunction barring Acushnet from
      selling the infringing line of Pro V1 golf balls.  Acushnet filed post-
      trial motions seeking a new trial and a ruling overturning the jury's
      verdict.  Acushnet also filed a motion seeking to stay any injunction
      that the Court might enter.

ANSWER: Acushnet admits that following the jury verdict Callaway filed a motion seeking a

permanent injunction and that Acushnet filed post-trial motions.

40.   On November 10, 2008, the Court issued an Order granting Callaway
      Golf's request that Acushnet's line of infringing Pro V1 golf balls,
      including the Pro V1 and Pro V1x golf balls, be enjoined and denying
      Acushnet's requests to overturn the jury's verdict and stay the
      injunction.

ANSWER: Acushnet admits that on November 10, 2008 the Court granted Callaway's request

for an injunction and denied Acushnet's post-trial motions.  Acushnet directs the Court to the

injunction issued on November 10, 2008 for the specific details of the injunction.  Otherwise,

Acushnet denies the allegations in paragraph 40.

    41.    Specifically the Court Ordered with respect to the injunction:

> 1.    Pursuant to 35 U.S.C. § 283, Acushnet and its successors, assigns, officers, agents, servants, employees, attorneys, and persons in active concert or participation with them, including any affiliated entities, during the term of the patents-in-suit (U.S. Patent Nos. 6,210,293; 6,503,156; 6,506,130; and 6,595,873), are hereby ENJOINED and RESTRAINED from infringing and from inducing, contributing to, or otherwise causing the infringement of the Relevant Patent Claims by making, using, selling, or offering to sell in the United States, or importing into the United States, or by inducing, contributing to, or otherwise causing the performance of any such activities by third parties with regard to, any of the Pro V1® line of golf balls including the Pro V1®, Pro V1x®, Pro V1*®, or any variations thereof not more than colorably different (collectively "the Pro V1® products").

> 2.    Acushnet's professional golfers currently under contract are permitted to play Pro V1® products through the end of the 2008 calendar year.

ANSWER:  Acushnet admits the allegations in paragraph 41.

    42.    On November 19, 2008 Acushnet filed a Notice of Appeal and also filed a motion with the United States Court of Appeals for the Federal Circuit seeking to stay the permanent injunction pending appeal.

ANSWER:  Acushnet admits the allegations in paragraph 42.

    43.    On December 23, 2008 the Federal Circuit issued an order denying Acushnet's request that the permanent injunction be stayed pending appeal.  The Federal Circuit further noted as one of its reasons for denying the stay that "…Acushnet has not demonstrated a strong likelihood of success [for its forthcoming appeal] in its motion papers."

ANSWER:  Acushnet admits that on December 23, 2008 the Federal Circuit denied Acushnet's

request for a stay of the injunction pending appeal without prejudice to the panel's consideration

of the merits.  Acushnet directs the Court to the December 23, 2008 order from the Federal

Circuit for the full text of its order.

    44.    Despite admitting that its line of Pro V1 golf balls made prior to September 2008 infringe Callaway Golf's patents, Acushnet has

repeatedly made misleading statements concerning the nature of its
golf balls, including the following:

a.  "The [Callaway Golf] patents at issue are directed to multi-layer, solid
    construction golf balls with urethane covers. Acushnet received its first
    patent covering this technology on March 3, 1999. The oldest of the
    Callaway patents being asserted was not filed until December 12, 1999
    and issued on March 15, 2001. The other three patents were all filed in
    2001, well after the Titleist Pro V1 was introduced at the Invensys Classic
    on October 12, 2000." This statement falsely implies that Acushnet was
    the first to patent the "Holy Grail" of golf ball technology that has made
    the Titleist Pro V1 'the best selling golf balls of all time." In truth,
    Acushnet knows that Sullivan conceived of his inventions years before
    Acushnet developed the Pro V1 golf ball, and Acushnet itself conceded
    that the priority filing date for all of the four Sullivan I patents was no
    later than 1995.

b.  "One [Acushnet] patent directly related to the Pro V1 was issued in 1999,
    before Spalding's 1999 application that led to a patent in 2001." Again,
    this statement falsely implies that Acushnet was the first to patent the
    "Holy Grail" of golf ball technology that has made the Titleist Pro V1 "the
    best selling golf balls of all time." The relevant Acushnet patent
    application was not filed until 1997, years after the 1995 patent
    applications which led directly to the Sullivan I patents.

c.  The litigation between Callaway Golf and Acushnet "relates to patents that
    were issued by the U.S. Patent and Trademark Office after the Pro V1
    came into the market and became the best-selling ball in golf." This
    statement falsely implies that the Sullivan I patents came after Acushnet's
    Pro V1, yet Acushnet itself knows and has conceded in Court filings that
    the Sullivan I patents were filed years before the Pro V1 came into the
    market.

d.  "With the Pro V1 and Pro V1x, players no longer have to trade-off
    distance and durability for spin, feel and control around the green." This
    statement falsely implies that Acushnet was the first to invent the "Holy
    Grail" golf ball with great distance and great control, and that the Titleist
    Pro V1 is that very ball. Yet, Acushnet knows and has admitted that Mr.
    Sullivan conceived of his patented golf ball long before the release of the
    Pro V1, and that Callaway Golf's own Rule 35 golf balls embodying that
    invention were in fact commercially introduced before the Titleist Pro V1
    products.

ANSWER: Denied. Acushnet further answers that, well before 1995, polyurethane was used in

balls having both solid and wound cores. For example, in 1994, Acushnet introduced the Titleist

Professional ball in the U.S., which had a wound core and a cast polyurethane cover. Ms.

Shenshen Wu, of Acushnet, obtained a patent on this cover in August 1994, U.S. Patent No.

5,334,673 ("the '673 patent" or "the Wu patent"). It was not until Spalding's inventor (Mr.

Sullivan) read the Wu patent that he even began to experiment with castable polyurethane

covers. By April 1995, years before the Sullivan I patents issued and months before their

priority dates, Acushnet had already asked Ms. Wu to make several golf balls having the basic

construction of the Pro V1 – a solid center, hard ionomer cover, and Wu's castable polyurethane

outer cover. Mr. Sullivan, on the other hand, never made golf balls with a thin castable urethane

cover like the Pro V1 construction. Moreover, to the extent that Callaway argues that a solid

core golf ball with an ionomer inner cover layer and a polyurethane outer cover layer is "the

Holy Grail of golf technology," such a construction was disclosed prior to the earliest filing dates

of either the Sullivan I or Sullivan II patents (*see e.g.,* GB 2 248 067 A, e.g., claim 17

incorporating claim 6), and was not invented by Sullivan.

45.   Further, Acushnet's parent company, Fortune Brands, Inc., told
      industry analysts in an earnings conference call on January 28, 2008 –
      a month after the jury found that the Sullivan patents infringed by
      Acushnet are not invalid – that Acushnet had a "very strong case" in
      part because "the golf ball [i.e., the Pro V1 line of golf balls] actually
      was out being sold before these [Sullivan] patents were issued." This
      statement, by Acushnet's parent, again falsely implied that Acushnet
      was the first to invent the "Holy Grail" golf ball with great distance
      and great control and that the Titleist Pro V1 is that ball, when
      Acushnet knows otherwise.

ANSWER: Acushnet admits that the Pro V1 golf ball was introduced in October of 2000, before

any of the Sullivan I patents issued; otherwise denied.

46.   Moreover, since the injunction order against the Titleist Pro V1 line of
      golf balls was issued in November 2008, Acushnet has made
      additional misleading statements, including but not limited to its
      statement that "Titleist Pro V1® golf balls are the product of
      technology developed and accumulated by Acushnet over the past 20

years, and over 65 Acushnet Company patents are related to the Pro
V1® family." This ignored Acushnet's continued and willful
infringement of Callaway Golf's Sullivan I patents, and that it was
those Callaway Golf patents that were key to Acushnet's ability to
manufacture and sell a ball that performed as well as competitive
offerings from Callaway Golf and others.

ANSWER: Acushnet admits that its Titleist Pro V1 golf balls are the product of technology

developed and accumulated by Acushnet over the past 20 years. Acushnet further admits that

over 65 Acushnet Company patents are related to the Pro V1 family. Acushnet denies the

remaining allegations in paragraph 46.

47.     Acushnet has also made multiple public statements questioning the
        validity of the Sullivan I patents and the revolutionary technology
        taught therein. Acushnet's public statements about the Sullivan I
        patents' validity stand in contrast to the sworn testimony of its own
        witness that the idea of a 3-piece ball with a thin polyurethane cover
        was truly novel and inventive at the relevant time.

ANSWER: Acushnet admits that it has stated its belief that the Sullivan I patents are invalid, as

supported by the United States Patent and Trademark Office, which has issued rejections of each

and every claim of those patents; otherwise denied.

48.     At the December, 2007 trial, William Morgan, Acushnet's Senior Vice
        President for Research and Development for golf balls, testified about
        his involvement in the Veneer project, Acushnet's effort to create a 3-
        piece ball with a polyurethane cover. At the time of Acushnet's
        Veneer project, Mr. Morgan had known of the use of thin polyurethane
        covers, such as cast thermoset polyurethane and was also aware of
        solid multi-layered balls. Yet, Mr. Morgan said that as of the Veneer
        project – which began *after* Mr. Sullivan's work – Mr. Morgan had
        never heard of anyone making a solid multilayer ball with a thin
        polyurethane cover, and he agreed that such a ball was a new idea at
        the time.

ANSWER: Denied. Acushnet further answers that, by April 1995, years before the Sullivan I

patents issued and months before their priority dates, Acushnet had already asked Ms. Wu to

make several golf balls having the basic construction of the Pro V1 – a solid center, hard

ionomer cover, and Wu's thin castable polyurethane outer cover. Mr. Sullivan never made a golf

ball with this basic Pro V1 construction.

49.    In fact, Mr. Morgan thought a 3-piece ball with a thin polyurethane
       cover was such a novel development that he submitted an invention
       record for the idea in April of 1996, along with fellow golf ball
       designers Dean Snell and Ed Hebert. Acushnet believed so strongly
       that this idea was inventive that the company filed a patent application
       based on that invention disclosure, eventually resulting in U.S. Patent
       No. 5,885,172.

ANSWER: Acushnet admits that it filed a patent application that eventually resulted in U.S.

Patent Number 5,885,172. Acushnet denies the remaining allegations in paragraph 49.

50.    Acushnet only changed its tune years later, when it learned that Mr.
       Sullivan, and not Acushnet's developers, was the first and true
       inventor of this revolutionary approach to golf ball design. Acushnet
       now issues frequent public statements attacking the validity of the
       technology that previously Acushnet swore was new and patentable.

ANSWER: Denied.

51.    Acushnet has intentionally and willfully misled golf professionals, golf
       shops, golf consumers and the public at large regarding the origin of
       the technology responsible for the success of its Pro V1. It has
       willfully made statements that fail to disclose that the most significant
       performance improvement of its Titleist Pro V1 golf balls – the
       combination of great distance and durability combined with great
       control which is enabled by the breakthrough construction of a thin,
       soft polyurethane cover used as part of a solid-core multi-layer ball –
       is claimed and covered by valid Callaway Golf patents. Instead,
       Acushnet has continued to state that it is the "industry leader" in golf
       ball design, despite its deliberate infringement of Callaway Golf
       patents, including the Sullivan I patents.

ANSWER: Denied.

52.    On information and belief, Acushnet's ability to retain the golf
       professionals as users and promoters of its Titleist branded golf balls,
       through the release of the infringing Titleist Pro V1, has supported the
       sales and success of Titleist's golf products generally, including its
       other golf ball products, as a result of the "pyramid of influence."

ANSWER: Denied.

## THE "CONVERTED" 2007 AND NEW 2009 PRO V1 LINE OF GOLF BALLS

53.     Even before the Court issued its permanent injunction, Acushnet modified the composition of its commercially successful Pro V1 and Pro V1x lines of golf balls to prepare for issuance of an injunction by the Court. Specifically, Acushnet modified the 2007 Pro V1 line of golf balls. Acushnet refers to these modified golf balls as "converted" golf balls.

ANSWER: Acushnet admits that it changed the composition of its 2007 Pro V1 and Pro V1x

lines of golf balls and that Acushnet refers to these modified 2007 golf balls as being

"converted." Acushnet denies the remaining allegations in paragraph 53.

54.     Although it changed the composition of its 2007 Pro V1 line of golf balls, Acushnet continued to make and sell golf balls under the Titleist Pro V1 and Pro V1x model names without changing the side stamp identification of the golf balls, calling them the best selling golf balls of all time and "The #1 Ball in Golf." Yet, the changed formulation was different from what had been historically sold as a Pro V1 golf ball. It was the prior, infringing, versions of Pro V1 golf balls that had achieved success historically, not the "converted" Pro V1 golf balls.

ANSWER: Denied.

55.     Acushnet has represented, to the public and this Court, that its converted 2007 and new 2009 lines of Pro V1 golf balls do not infringe Callaway Golf's patents.

ANSWER: Acushnet admits that it has represented that its converted 2007 and new 2009 lines

of Pro V1 golf balls do not infringe any valid claim of Callaway Golf's patents.

56.     Like its launch of the original infringing Pro V1 in 2000, Acushnet has persuaded professional golfers to adopt the 2009 version of the Pro V1 and Pro V1x golf balls, proclaiming that Titleist is again "#1 from the start" based on use of its Pro V1 golf balls on the PGA Tour in 2009. Callaway Golf, however, has determined that both the "converted" 2007 line of Pro V1 golf balls and the new 2009 golf balls infringe the Sullivan II patents.

ANSWER: Denied.

57.     Acushnet has sold converted 2007 Titleist Pro V1 and Pro V1x balls
and is currently marketing, making, and selling 2009 versions of the
Titleist Pro V1 and Pro V1x balls.

ANSWER: Acushnet admits the allegations in paragraph 57.

## COUNT I – INFRINGEMENT OF THE '633 PATENT

58.     Callaway Golf incorporates and realleges the allegations of paragraphs
1 through 57 as if fully set forth herein.

ANSWER: Acushnet incorporates herein and realleges its answers to paragraphs 1-57.

59.     Callaway Golf is the owner by assignment of United States Patent No.
6,495,633 B1, entitled "Dual core for golf balls" ("the '633 patent"),
which was duly and legally issued by the United States Patent and
Trademark Office on December 17, 2002. A copy of the '633 patent is
attached as Exhibit A to this Complaint. The named inventors are
Michael J. Sullivan and R. Dennis Nesbitt.

ANSWER: Acushnet admits that a copy of the '633 patent is attached as Exhibit A to the

complaint and that the '633 patent was issued by the United States Patent and Trademark Office

on December 17, 2002. Acushnet further admits that the '633 patent is entitled "Dual core for

golf balls," and that Michael J. Sullivan and R. Dennis Nesbitt are the alleged inventors.

Acushnet is without information or knowledge sufficient to form a belief as to the truth of the

remaining allegations of paragraph 59 and therefore denies the same.

60.     Acushnet has infringed directly, by inducement, and/or contributorily
one or more claims of the '633 patent by making, using, selling and/or
offering to sell infringing golf balls, including without limitation its
converted 2007 and new 2009 Pro V1x golf balls.

ANSWER: Denied.

61.     Acushnet has and has had actual notice of the '633 patent and/or
constructive notice of the '633 patent pursuant to 35 U.S.C. § 287(a).

ANSWER: The allegations in paragraph 61 are vague and ambiguous with respect to time.

Therefore, Acushnet denies the same.

62.    Acushnet's infringement of the '633 patent has been and continues to be willful.

ANSWER:  Denied.

## COUNT II – INFRINGEMENT OF THE '381 PATENT

63.    Callaway Golf incorporates and realleges the allegations of paragraphs 1 through 57 as if fully set forth herein.

ANSWER:  Acushnet incorporates herein and realleges its answers to paragraphs 1-57.

64.    Callaway Golf is the owner by assignment of United States Patent No. 6,623,381 B2, entitled "Multi-layer golf ball" ("the '381 patent"), which was duly and legally issued by the United States Patent and Trademark Office on September 23, 2003.  A copy of the '381 patent is attached as Exhibit B to this Complaint.  The named inventor is Michael J. Sullivan.

ANSWER:  Acushnet admits that a copy of the '381 patent is attached as Exhibit B to the complaint and that the '381 patent was issued by the United States Patent and Trademark Office on September 23, 2003.  Acushnet further admits that the '381 patent is entitled "Multi-layer golf ball," and that Michael J. Sullivan is the alleged inventor.  Acushnet is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations of paragraph 64 and therefore denies the same.

65.    Acushnet has infringed directly, by inducement, and/or contributorily one or more claims of the '381 patent by making, using, selling and/or offering to sell infringing golf balls, including without limitation its converted 2007 and new 2009 Pro V1 and Pro V1x golf balls.

ANSWER:  Denied.

66.    Acushnet has and has had actual notice of the '381 patent and/or constructive notice of the '381 patent pursuant to 35 U.S.C. § 287(a).

ANSWER:  The allegations in paragraph 66 are vague and ambiguous with respect to time. Therefore, Acushnet denies the same.

67.     Acushnet's infringement of the '381 patent has been and continues to
be willful.

ANSWER:  Denied.

Further answering, Acushnet denies that Callaway is entitled to the requested relief

identified in items (1)-(8) of its Prayer For Relief or any other relief.

## DEFENSES

Acushnet hereby asserts the following defenses without undertaking or otherwise shifting

any applicable burdens of proof.  Acushnet reserves the right to assert additional defenses, as

warranted, by facts learned through investigation and discovery.

### FIRST DEFENSE
### (Failure to State a Claim)

68.     The Complaint fails to state a claim on which relief can be granted.

### SECOND DEFENSE
### (Non-Infringement)

69.     Acushnet does not infringe, has not infringed, and does not and has not induced or

contributed to infringement of any valid claim of the '633 or '381 patents.

### THIRD DEFENSE
### (Invalidity Under 35 U.S.C. §§ 101 *et seq.*)

70.     Each claim of the '381 and '633 patents is invalid for failure to comply with one

or more provisions of the Patent Act (35 U.S.C. §§101 *et seq.*).

### FOURTH DEFENSE
### (Prosecution Laches)

71.     Callaway's claims relating to the'381 patent are barred by the equitable doctrine

of prosecution laches.

## COUNTERCLAIMS

Counterclaimant Acushnet alleges the following counterclaims against Counterdefendant Callaway.

## PARTIES AND JURISDICTION

72.     Acushnet is a corporation organized and existing under the laws of the state of Delaware and having its principal place of business at 333 Bridge Street, Fairhaven, Massachusetts 02719.

73.     Callaway Golf Company, upon information and belief, is a corporation existing under the laws of the State of Delaware, having a principal place of business in Carlsbad, California.

74.     This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367(a), 2201 and 2202, and 35 U.S.C. § 1, et seq.

75.     Callaway has submitted to personal jurisdiction of this Court.

76.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 because this suit was filed in this district by Callaway and Callaway has made, used, sold and offered to sell and continues to make, use, sell, and offer to sell golf balls in this district and pursuant to a 2008 Litigation Settlement Agreement between Acushnet and Callaway, §11.2.

## FACTUAL ALLEGATIONS AND BACKGROUND

77.     Acushnet is a market leader in the manufacture and design of golf equipment. Acushnet develops and sells products under the brand names of Titleist®, FootJoy®, Cobra®, Pinnacle®, and Scotty Cameron®.

78.     Acushnet has been manufacturing golf balls under the Titleist® name since 1935. Acushnet's Titleist® golf balls have been recognized by both professionals and general

consumers as the best golf balls on the market. In fact, 2008 marked the 60th straight year that Titleist® products were the most-used products at the U.S. Open.

79.     To maintain its reputation as a premier golf ball manufacturer, Acushnet has developed and continues to develop new technologies for use in its golf balls. In 1994 Acushnet introduced the Titleist Professional ball in the U.S., which had a wound core and a cast polyurethane cover. Ms. Shenshen Wu, of Acushnet, obtained a patent on this cover in August 1994 (U.S. Patent No. 5,334,673 ("the '673 patent")) based on a patent application filed in 1990.

80.     By April 1995, Ms. Wu applied her patented outer cover to several golf balls having a solid center and a hard ionomer inner cover. This construction became the basic concept behind the Pro V1 family of golf balls.

81.     Acushnet's Pro V1 family of golf balls are the product of technology developed and accumulated by Acushnet over the past 20 years and which relate to over 65 Acushnet Company patents, including Ms. Wu's '673 patent.

82.     In 2003, Callaway purchased several patents out of the bankruptcy estate of Spalding Sports Worldwide, Inc. which purport to cover golf balls with a solid core, hard inner cover and urethane outer cover (collectively "the Sullivan patents," including the Sullivan I and Sullivan II patents as defined herein by Callaway).

83.     Despite the fact that Acushnet's Ms. Wu had made golf balls with this basic construction years before any of the Sullivan patents issued, and months before any of their priority dates, Callaway has accused Acushnet's Pro V1 family of golf balls of infringing the Sullivan I and Sullivan II patents.

84.     It was not until Spalding's inventor (Mr. Sullivan) read the Wu patent that he even began to experiment with castable polyurethane covers.  Mr. Sullivan never made golf balls with a thin castable urethane cover like that used in the Pro V1 construction.

85.     The United States Patent and Trademark Office, in reexamination proceedings, has issued rejections of each and every claim of the Sullivan I patents under 35 U.S.C. §§ 102 and 103, as being invalid in light of several prior art patents.  The PTO has further issued final office actions rejecting all claims and has closed prosecution.  Seven PTO examiners (two primary and five conferees) have agreed that the Sullivan I patents should never have issued.

86.     Acushnet has now filed reexamination on the Sullivan II patents, which are currently pending before the PTO.  Claims nearly identical to those contained in the Sullivan II patents were already rejected by the PTO during examination of related patents.

## COUNTERCLAIM I
### (Declaratory Judgment Against The '633 Patent)

87.     Acushnet repeats and realleges paragraphs 72-86 above as if fully set forth herein.

88.     Callaway purports to be the assignee and lawful owner of all right, title and interest in and to the '633 patent.

89.     Callaway has sued Acushnet in the present action, alleging infringement of the '633 patent.

90.     Acushnet, however, does not infringe, has not infringed, and does not and has not induced infringement or contributed to infringement of any valid claim of the '633 patent under any theory, including literal infringement or infringement under the doctrine of equivalents.

91.     The claims of the '633 patent are invalid for failure to meet the conditions of patentability specified in 35 U.S.C. §§ 101, 102, 103 and/or 112.

92.     Thus, an immediate, real and justiciable controversy exists between Acushnet and Callaway with respect to the alleged infringement and invalidity of the '633 patent.  Acushnet requests declaratory judgment that Acushnet has not and does not infringe, directly or indirectly, any valid claim of the '633 patent, and that the claims of the '633 patent are invalid.

## COUNTERCLAIM II
### (Declaratory Judgment Against The '381 Patent)

93.     Acushnet repeats and realleges paragraphs 72-86 above as if fully set forth herein.

94.     Callaway purports to be the assignee and lawful owner of all right, title and interest in and to the '381 patent.

95.     Callaway has sued Acushnet in the present action, alleging infringement of the '381 patent.

96.     Acushnet, however, does not infringe, has not infringed, and does not and has not induced infringement or contributed to infringement of any valid claim of the '381 patent under any theory, including literal infringement or infringement under the doctrine of equivalents.

97.     The claims of the '381 patent are invalid for failure to meet the conditions of patentability specified in 35 U.S.C. §§ 101, 102, 103 and/or 112.

98.     Thus, an immediate, real and justiciable controversy exists between Acushnet and Callaway with respect to the alleged infringement and invalidity of the '381 patent.  Acushnet requests declaratory judgment that Acushnet has not and does not infringe, directly or indirectly, any valid claim of the '381 patent, and that the claims of the '381 patent are invalid.

## ACUSHNET'S PRAYER FOR RELIEF

Wherefore, Acushnet prays for a judgment as follows:

1.      That Callaway take nothing and be granted no relief;

2.      That Callaway's alleged claims for relief, and each of them, be dismissed with prejudice;

3.      Declare that Acushnet does not infringe any valid claim of the '633 and '381 patents;

4.      Declare that the '633 and the '381 patents are invalid;

5.      Declare that the '381 patent is unenforceable due to prosecution laches;

6.      Declare this case an exceptional case pursuant to 35 U.S.C. § 285;

7.      That Acushnet be awarded its costs and attorneys' fees and such other and further relief as the Court deems just and proper.

Respectfully submitted,

OF COUNSEL:                              POTTER ANDERSON & CORROON LLP

Henry Bunsow
HOWREY LLP                               By:   /s/ Richard L. Horwitz
525 Market Street, Suite 3600                  Richard L. Horwitz (#2246)
San Francisco, CA 94105                        David E. Moore (#3983)
Tel: (415) 848-4900                            Hercules Plaza, 6th Floor
                                               1313 North Market Street
Joseph P. Lavelle                              Wilmington, DE 19801
Kenneth W. Donnelly                            Tel: (302) 984-6000
Brian A. Rosenthal                             rhorwitz@potteranderson.com
HOWREY LLP                                     dmoore@potteranderson.com
1299 Pennsylvania Ave., N.W.
Washington, DC 20004                     Counsel for Acushnet Company
Tel: (202) 783-0800

Dated: April 17, 2009
912366 / 30030-001

24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on April 17, 2009, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on April 17, 2009, the attached document was Electronically Mailed to the following person(s):

Thomas L. Halkowski
Fish & Richardson P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE  19899-1114
halkowski@fr.com

Frank E. Scherkenbach
Fish & Richardson P.C.
225 Franklin Street
Boston, MA  02110-2804
scherkenbach@fr.com

Michael J. Kane
Fish & Richardson P.C.
3300 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
kane@fr.com

Robert A. Denning
John W. Thornburgh
Jennifer K. Bush
Fish & Richardson P.C.
12290 El Camino Real
San Diego, CA  92130
denning@fr.com
thornburgh@fr.com
bush@fr.com

*/s/ Richard L. Horwitz*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

905473 / 30030-001 (09-131)