# FISH & RICHARDSON P.C.

17TH FLOOR
222 DELAWARE AVENUE
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

**Thomas L. Halkowski**
302 778-8407

Email
halkowski@fr.com

**VIA ECF AND HAND DELIVERY**

November 9, 2010

The Honorable Mary Pat Thynge
United States Magistrate Judge
U.S. District Court for the District of Delaware
844 N. King Street
Wilmington, DE 19801

Re:  *Acushnet Company v. Callaway Golf Company*
USDC-D. Del. - C.A. No. 09-130-SLR
*Callaway Golf Company v. Acushnet Company*
USDC-D. Del. – C.A. No. 09-131 SLR

Dear Judge Thynge:

Callaway Golf Company respectfully asks that the Court compel the United States Golf Association ("USGA") to produce highly relevant test data regarding prior art golf balls in response to a subpoena served on September 15, 2010 (attached hereto as Exhibit A).

**Background**

In Case No. 09-130-SLR, Acushnet has asserted nine patents against Callaway, four of which concern aerodynamic properties of golf balls ("the Acushnet aero patents").[1]

Those of skill in the art characterize the aerodynamic properties of golf balls, which relate to the forces exerted on a ball in flight, using various aerodynamic "coefficients," such as the coefficient of lift and the coefficient of drag. These coefficients vary for a given golf ball depending on a number of factors, including the ball's velocity (reflected by a parameter known as the Reynolds Number) and how fast the ball is spinning in flight (*a.k.a.*, Spin Ratio). These coefficients may be determined by evaluating the flight performance of golf balls at various conditions in indoor testing ranges, wind tunnels or the like.

The Acushnet aero patents claim golf balls with certain aerodynamic coefficients. The '137 patent claims golf balls that demonstrate similar aerodynamic coefficients (for instance, less than 3% deviation) over a range of Reynolds Numbers and Spin Ratios regardless of the orientation from which the golf ball is struck or launched.[2] The other three aero patents claim certain ratios between the aerodynamic coefficients at high and low speeds.[3]

---

[1]  Two of the relevant patents, U.S. Patent Nos. 7,491,137 ("the '137 patent") and 6,945,880 ("the '880 patent"), are attached hereto as Exhibits B and C.

[2]  Claim 1, for instance, recites a golf ball with a "percent deviation $C_{mag}$ [of] about 3 percent or less over a Reynolds Number range of above 69,000 to about 230,000" when a golf ball flies at different orientations. "$C_{mag}$" is an aerodynamic coefficient that takes both lift and drag into account.

FISH & RICHARDSON P.C.
The Honorable Mary Pat Thynge
Page 2

The USGA, as part of its role as the governing body of golf for the United States, performs "distance and symmetry conformance tests" to assess whether golf balls sold by manufacturers conform to the Rules of Golf. Indeed, the USGA requires that golf balls "must not be designed, manufactured or intentionally modified to have properties which differ from those of a spherically symmetrical ball." *See* Exhibit D, Appendix III. The '137 patent essentially claims this basic rule, despite the existence of the rule years before the priority date for the '137 patent.

In order to determine if a golf ball meets the Rules of Golf, including the symmetry requirement, "the aerodynamic properties of a sample lot of golf balls are completely characterized by the coefficients of lift ($C_L$), and coefficient of drag ($C_D$)." *See* Exhibit E, Section 3. On September 15, 2010, Callaway served a subpoena on the USGA seeking any aerodynamic testing data it collected prior to January 2003 – the apparent priority date for three of the four asserted aerodynamic patents. Callaway sought this data to establish the scope and content of the prior art, as well as to identify golf balls that may invalidate Acushnet's patents. The USGA, however, refused to produce any of its aerodynamic testing data.

As part of an effort to resolve this dispute, Callaway offered the USGA two potential alternatives to producing the relevant data. First, Callaway offered to have its expert travel to the USGA to analyze the data on the USGA's computers, so that the data would remain within the possession and control of the USGA. Second, Callaway offered to let the USGA perform certain queries on its data to identify those balls that appeared to be most relevant. The USGA declined both of these offers and continues to refuse to produce its test data.

**Statement of Law**

Rule 26 allows for discovery of "any nonprivileged matter that is relevant to any party's claim or defense." F.R.C.P. 26(b)(1). "Relevance for discovery purposes is given very broad meaning. This is especially true because determinations of relevance for discovery purposes are made well in advance of trial.… Therefore, only if it is palpable that the evidence sought can have no possible bearing upon the issues should a court deny discovery by quashing a subpoena." *Cash Today of Tex. v. Greenberg*, 2002 U.S. Dist. LEXIS 20694 at *4 (D. Del. 2002).

Because the USGA is a third party, the Federal Rules require Callaway and the Court to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." F.R.C.P. 45(c)(1). "In determining if compliance with the subpoena would create an undue burden, the court should consider not only the potential burden to the producing party, but the necessity of the information for the party seeking production, and whether the information can be obtained from other, more convenient sources." *Cash Today* at *13.

**Argument**

The discovery requested in Callaway's subpoena relates to "prior art" – specifically, aerodynamic data the USGA collected from golf balls available prior to January 2003. The information Callaway seeks is therefore relevant to show, for example, whether the claimed

---

[3] Claim 1 of the '880 patent, for instance, recites a golf ball with certain physical characteristics having "a ratio of coefficient of aerodynamic forces at Reynolds Number of 180,000 and spin ratio of 0.110 to coefficient of aerodynamic forces at Reynolds Number of 70,000 and spin ratio of 0.188 of about 0.780 or less."

inventions are obvious.  *See Graham v. John Deere*, 383 US 1, 17 (1966) ("Under [35 U.S.C.] § 103, the scope and content of the prior art are to be determined").

Also, Callaway has a vital need for the requested information and cannot obtain it from other, more convenient sources.  Callaway is not aware of any other source with the extensive collection of aero data possessed by the USGA.  Callaway cannot simply re-create this data on its own by testing prior art golf balls – Callaway does not have access to all of the prior art golf balls that the USGA tested over the years, and even if it could obtain some of those balls it would be incredibly expensive and time consuming to recreate test data that already exists at the USGA.

During Callaway's effort to work with the USGA to amicably resolve this issue, the USGA raised two main arguments for why it refuses to produce the aerodynamic data.  First, the USGA argued that the data it has collected is irrelevant because the test results were obtained at conditions that differ somewhat from those set forth in Acushnet's patents and that it is not possible to accurately state if any of the golf balls tested by USGA fall within the claimed ranges in Acushnet's patents.  The USGA is mistaken.  Callaway, with its experts, is able to perform calculations[4] on the USGA's data which will allow reasonable assessments to be made regarding how the data from the prior art golf balls compares to Acushnet's patents.  Also, whether or not any of these golf balls fall precisely within Acushnet's claims, the data is still relevant for obviousness – in other words, all of these pre-2003 golf balls are "prior art" and golf balls falling outside the claimed ranges may still help to demonstrate that the claimed inventions are obvious.

Second, the USGA argues that it receives "highly confidential products" and that golf equipment manufacturers have an "expectation of confidentiality."  However, the USGA publicly discloses those golf balls that pass its tests in a "conforming golf ball list."  These balls may then be used in USGA-sanctioned competitions and are typically sold to the public.  Moreover, the data Callaway seeks was measured by the USGA, not submitted by manufacturers.  It is not an internal recipe or secret formula; rather it is simply measurements of observable performance characteristics.  In any event, Callaway has even agreed to treat any USGA materials as Highly Confidential under the Court's protective order, including destroying or returning all such USGA data upon termination of this litigation.

During the lengthy meet and confer process, the USGA has not made any arguments that producing its data would be unduly burdensome.  The USGA is the governing body for golf in the United States, and it is the sole repository for an extensive cache of historic data.  Callaway, therefore, respectfully requests that the Court compel the USGA to produce this relevant data pursuant to Callaway's subpoena.

Respectfully submitted,

*/s/ Thomas L. Halkowski*

Thomas L. Halkowski

---

[4]  The USGA initially offered to perform calculations on its data, it later declined to do so because it argued the results would be "too speculative."  But the calculations at issue stem from the patents themselves – they are not created by Callaway.  And, whether the balls identified actually fall within the claims would ultimately be a fact issue for trial; it should not stand in the way of identifying potentially invalidating prior art during discovery.