IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALLAWAY GOLF COMPANY, <br><br> Plaintiff/Defendant, <br><br> v. <br><br> ACUSHNET COMPANY, <br><br> Defendant/Plaintiff. | C. A. No. 09-130 (SLR) <br><br> C. A. No. 09-131 (SLR) |

**CALLAWAY GOLF'S NOTICE OF DEPOSITION PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) TO ACUSHNET COMPANY**

TO ACUSHNET COMPANY AND ITS ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, Callaway Golf Company ("Callaway Golf") will take the deposition of Acushnet Company ("Acushnet") at a mutually agreed upon location, commencing at 9:00 a.m. on December 22, 2010, or at another time agreed upon by the parties, or ordered by the Court. The deposition will continue from day to day thereafter until complete. The deposition will take place upon oral examination pursuant to the Federal Rules of Civil Procedure before an officer duly authorized by law to administer oaths and record testimony. Some or all of the deposition testimony may be recorded stenographically and may be recorded by videotape. Some or all of the deposition testimony may involve real-time computer connection between the deposition taker and stenographer using software such as "LiveNote."

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Acushnet is obligated to designate one or more of its officers, directors, or managing agents, and/or one or more other persons who consent to testify on its behalf concerning the matters set forth in Attachment A.

1

Acushnet is requested to set forth, for each person designated, the matters on which the person will testify.

Dated: December 3, 2010              FISH & RICHARDSON P.C.


                                     By: */s/ Thomas L. Halkowski*
                                         Thomas L. Halkowski (#4099)
                                         222 Delaware Avenue, 17th Floor
                                         P.O. Box 1114
                                         Wilmington, DE 19899-1114
                                         Tel: (302) 652-5070
                                         Fax: (302) 652-0607

                                         Frank E. Scherkenbach
                                         One Marina Park Drive
                                         Boston, MA 02110-2804
                                         Tel: (617) 542-5070
                                         Fax: (617) 542-8906

                                         Michael J. Kane
                                         3300 RBC Plaza
                                         60 South Sixth Street
                                         Minneapolis, MN 55402
                                         612-335-5070 Telephone
                                         612-288-9696 Facsimile

                                         Roger A. Denning
                                         John W. Thornburgh
                                         12390 El Camino Real
                                         San Diego, CA 92130
                                         Tel: (858) 678-5070
                                         Fax: (858) 678-5099

                                         *Attorneys for Plaintiff*
                                         *Callaway Golf Company*

## ATTACHMENT A

## DEFINITIONS

As used in these Requests, the following terms have the meanings indicated:

1. "Callaway Golf" means Callaway Golf Company, including its officers, directors, employees, agents, and attorneys.

2. "Top-Flite Golf" means Top-Flite Golf Company, including its officers, directors, employees, agents, and attorneys. "Top-Flite Golf" means Callaway Golf Ball Operations, formerly known as The Top-Flite Golf Company, including its officers, directors, employees, agents, and attorneys.

3. "Acushnet," "you," or "your" means Acushnet Company, a wholly-owned operating company of Fortune Brands, Inc. ("Fortune Brands"), including its past and present officers, directors, employees, consultants, agents, and attorneys and others acting or purporting to act on its behalf, and including their predecessors, subsidiaries, parents, and affiliates.

4. The phrase the "'293 patent" means U.S. Patent No. 6,210,293.

5. The phrase the "'156 patent" means U.S. Patent No. 6,503,156.

6. The phrase the "'130 patent" means U.S. Patent No. 6,506,130.

7. The phrase the "'873 patent" means U.S. Patent No. 6,595,873.

8. The phrase the "'633 patent" means U.S. Patent No. 6,495,633 B1.

9. The phrase the "'381 patent" means U.S. Patent No. 6,623,381 B2.

10. The phrase "Sullivan I patents" means the '293, '156, '130, and '873 patents.

11. The phrase "Sullivan II patents" means the '633 and '381 patents.

12. The phrase the "'547 patent" means U.S. Patent No. 6,913,547.

13. The phrase the "'656 patent" means U.S. Patent No. 7,255,656.

14. The phrase the "'369 patent" means U.S. Patent No. 7,226,369.

15. The phrase the "'880 patent" means U.S. Patent No. 6,945,880.

16. The phrase the "'195 patent" means U.S. Patent No. 7,473,195.

17. The phrase the "'137 patent" means U.S. Patent No. 7,491,137.

18. The phrase the "'426 patent" means U.S. Patent No. 6,905,426.

19. The phrase the "'601 patent" means U.S. Patent No. 7,455,601.

20. The phrase the "'040 patent" means U.S. Patent No. 6,180,040.

21. The phrase "Acushnet Patents" means the '547, '656, '369, '880, '195, '137, '426, '601, and '040 patents.

22. The phrase "Patents-in-Suit" means the "Sullivan II patents" as identified in paragraphs 8, 9, and 11 and the "Acushnet Patents" as identified in paragraphs 12-21.

23. The phrase "genealogically related patents" includes all patents and patent applications related to the "Acushnet Patents" in any way, including without limitation any parent, continuation, continuation-in-part, divisional, reexamination, reissue, or foreign counterpart patent or application of any of the Acushnet Patents or for patents that are listed as related patents for the Acushnet Patents.

24. The phrase "the Sullivan patents" means the Sullivan I and Sullivan II patents.

25. The word "Document" is used herein in its broadest sense to include everything that is contemplated by Rule 26 and Rule 34 of the Federal Rules of Civil Procedure, including Documents stored in hard copy or electronic form.  Electronic Documents include electronic mail and Documents stored on any media accessible by electronic means.  A comment or notation appearing on any "Document" and not a part of the original text is to be considered a separate "Document".

26. "Thing" means any tangible object other than a Document.

27. "Person" or "Persons" includes not only natural individuals, but also, without limitation, firms, partnerships, associations, corporations, and other legal entities, and divisions, departments, or other units thereof.

28. "Including" shall mean "including but not limited to."

29. The terms "and" and "or" shall be construed conjunctively or disjunctively, whichever makes the individual request more inclusive.

30. The singular and masculine form of any noun or pronoun shall embrace and be read and applied as embracing the plural, the feminine, and the neuter, except where circumstances clearly make it inappropriate.

31. "Infringed " and any variant thereof, refers to any form of infringement actionable under United States law, including direct infringement, contributory infringement, inducement to infringe, literal infringement, and infringement under the doctrine of equivalents.

32. "Concerning" means relating to, referring to, describing, discussing, depicting, evidencing, identifying or constituting.

33. The terms "refer," "referring," "relate," or "relating" as used herein include, but are not limited to, the following meanings: bearing upon, concerning, constituting, discussing, describing, evidencing, identifying, concerning, mentioning, in connection with, pertaining to, respecting, regarding, responding to, or in any way factually or logically relevant to the matter described in the request.

34. The phrase "converted 2007 Pro V1 golf balls" means Acushnet's modified 2007 Pro V1 and Pro V1x lines of golf balls.

35. The phrase " 2009 lines of Pro V1 golf balls" means Acushnet's 2009 versions of the Pro V1 and Pro V1x golf balls.

36. The term "Acushnet Accused Products" means all versions and/or variants of the converted 2007 Pro V1 golf balls and the 2009 lines of Pro V1 golf balls.

37. The term "Callaway Golf Accused Product(s)" means the following golf balls: Callaway Golf Tour i, Callaway Golf Tour ix, Callaway Golf Tour is, Callaway Golf Tour iz, Big Bertha Diablo, Warbird Plus, HX Pearl, HX Hot Plus, HX Hot Bite, HX Hot, and Big Bertha.

38. "Acushnet Covered Products" means any golf ball product made by or on behalf of Acushnet that Acushnet contends embodies or is marked with one or more of the Acushnet Patents.

## TOPICS

1. Acushnet's document retention policies.

2. The custodian(s) of documents requested in Callaway Golf's requests for production of documents and things.

3. Acushnet's efforts to gather and produce documents and information in response to Callaway Golf's discovery requests.

4. All facts and circumstances regarding Acushnet's decision to design and redesign (1) the converted 2007 Pro V1 golf balls, and (2) the 2009 lines of Pro V1 golf balls.

5. The process(es) followed by Acushnet in designing, redesigning, specifying, developing, implementing, testing, maintaining and updating the Acushnet Accused Products.

6. The design, redesign, and development of the Acushnet Accused Products, including layer thicknesses; materials used; and those materials' physical properties, alone and in combination with each other.

7. The chemical composition and physical properties of the core, and the inner and outer cover layers of the Acushnet Accused Products.

8. The manufacturing guidelines, manuals, or specifications for the Acushnet Accused Products.

9. Testing procedures and results concerning the Acushnet Accused Products and the inner and outer cover layers thereof before, during and after manufacture, including an identification of what kinds of tests are performed by Acushnet or on Acushnet's behalf; results of coefficient of restitution (COR) testing; results of flex modulus testing; and analysis of chemical components.

10. Identification of all existing and planned future golf ball products of Acushnet having multiple layers over a solid core, including but not limited to golf balls having a dual core.

11. The decision to include Fusabond (or chemically similar compounds) in the inner cover layer of the Acushnet Accused Products, the function of Fusabond (or chemically similar compounds) in the inner cover layer of the Acushnet Accused Products, and the effects, if any, that Fusabond had and has on the chemical, physical, and/or performance characteristics of the Acushnet Accused Products.

12. All facts and circumstances surrounding Acushnet's decisions to (1) discontinue the manufacture of golf balls with wound cores; and (2) transition to multi-layer golf balls with solid cores.

13. Any comparisons, including chemical and physical testing, done by, analyzed by, or reviewed by Acushnet concerning the Acushnet Accused Products and any other products, including other solid core multi-layer golf balls and wound golf balls.

14. Acushnet's study, comparison, evaluation, opinion, and testing practices in general regarding any solid core multi-layer golf balls, including testing any Callaway Golf and or Top-Flite solid core multi-layer golf balls.

15. Any analysis, belief, or opinion, including opinions of counsel, you have received regarding the validity, enforceability and/or infringement regarding the Sullivan II Patents.

16. Identification of persons responsible for the design, specification, development, implementation or testing of the Acushnet Accused Products, and the specific responsibilities of each such person in that regard.

17. Advertising and marketing efforts for the Acushnet Accused Products, including the identities of all individuals responsible for advertising and marketing the Accused Products and their responsibilities.

18. All communications between you and any third party, including but not limited to, third party advertising agencies, media outlets, professional golfers and/or third party material suppliers, regarding the Acushnet Accused Products.

19. Licensing of any patents covering the Acushnet Accused Products or other multi-layer golf balls.

20. The revenue, income, costs, and profits to Acushnet realized from the sale and/or licensing of the Acushnet Accused Products worldwide from 2007 to the present, including, but not limited to, on a monthly, quarterly, and/or yearly basis, by product and date: (a) the units sold and/or licensed; (b) the average sale and/or license price (billed); (c) the costs of goods sold; (d) the gross revenue generated; (e) the gross profit margin; and (f) the net profit margin.

21. Identification of golf balls that compete or have competed with the Acushnet Accused Products from 2007 to the present, i.e. golf balls in the premium golf ball market.

22. Communications or statements regarding any impact that the Acushnet Accused Products and/or other multi-layer premium golf balls have had on the game of golf, including golf courses.

23. Praise for the Acushnet Accused Products and/or other multi-layer premium golf balls.

24. All efforts and the results of such efforts by Acushnet to license golf ball patents that cover any element of the Acushnet Accused Products.

.

25. Acushnet's manufacturing, including manufacturing trials for the Acushnet Accused Products and any documentation of scrap materials resulting from the trials.

26. The design, specification, development, implementation, testing, and manufacture of Acushnet Covered Products.

27. Any analysis, belief, or opinion regarding the validity, enforceability and/or infringement by any party of any of the Acushnet Patents, including statements made by you to the U.S. Patent and Trademark Office during prosecution of any of the Acushnet Patents.

28. All opinions, investigations, or analyses of the validity, enforceability, or infringement by any party, of the Acushnet Patents performed by Acushnet, or at its direction.

29. Communications between Acushnet and any third party concerning Callaway Golf, Top-Flite, the Patents-in-Suit, or this litigation.

30. The product and marketing plans for any Acushnet Covered Product.

31. Market research conducted or commissioned by Acushnet concerning any Acushnet Covered Product, any competing golf ball products manufactured by any person, and/or any other golf ball products manufactured by Callaway Golf or Top-Flite.

32. All comparisons made by or on behalf of Acushnet between any Acushnet Covered Product and any other products, including the Callaway Golf Accused Products.

33. The structure, composition, physical properties, and aerodynamic properties of any Acushnet Covered Product, prior art golf ball, competitive golf ball, and all balls described in the specifications of the Acushnet Patents.

34. The market for each Acushnet Covered Product, including without limitation each of Acushnet's competitors, each competing product, competitive strengths and weaknesses of each Acushnet Covered Product and each competing product, and the market share for each Acushnet Covered Product.

35. The marketing of each Acushnet Covered Product, including the features or characteristics of each Acushnet Covered Product identified in the marketing for each product, the pricing, the promotion, and the distribution strategies for each such product.

36. Advertising conducted by or on behalf of Acushnet for each Acushnet Covered Product.

37. Acushnet's patent licensing policies and practices.

38. Licenses or other agreements entered into by Acushnet the concern or cover any of the Acushnet Covered Products or any technology incorporated in or used to manufacture the Acushnet Covered Products.

39. Licenses, offers to license, or other agreements entered into or negotiated by Acushnet involving the Acushnet Patents.

40. All patent licenses concerning golf balls that Acushnet has entered into and associated negotiations regarding those license agreements.

41. All instances in which Acushnet has asserted, either formally or informally, one or more of the Acushnet Patents against any other party, including the circumstances surrounding such instances and all communications, negotiations or investigations related to those assertions.

42. Any communications involving Acushnet that discuss or involve the validity or enforceability of the Patents-in-Suit.

43. The conception, reduction to practice, diligence up to reduction to practice and other alleged inventive activities related to the Acushnet Patents.

44. Acushnet's efforts to generate, measure, calculate, and/or determine the properties of any golf ball referenced in, or any data disclosed in, any specification of any of the Acushnet Patents.

45. The preparation, filing and prosecution of the applications that resulted in the issuance of the Acushnet patents and/or any other genealogically related patents.

46. The acquisition, set-up, use of, and results from Acushnet's indoor test range (ITR), including the calibration and maintenance of the ITR.

47. The acquisition, set-up, use of, and results from Acushnet's wind tunnel test facility, including the calibration and maintenance of the wind tunnel test facility.

48. Acushnet's efforts to generate, measure, calculate, simulate, and/or determine the aerodynamic properties of golf balls, including but not limited to the lift coefficients, drag coefficients, coefficients of magnitude and aerodynamic force angles of golf balls at certain Reynolds numbers and spin ratios.

49. Acushnet's efforts to generate, measure, calculate, simulate, and/or determine the aerodynamic properties of Callaway Golf's Accused Products, including but not limited to the lift coefficients, drag coefficients, coefficients of magnitude and aerodynamic force angles of the Callaway Golf Accused Products at certain Reynolds numbers and spin ratios.

50. The processes, procedures, methods, equipment, calibration, standards, and maintenance for all efforts and tests referenced in Topics 47 and 48, above.

51. Acushnet's efforts to generate, measure, calculate, and/or determine the deflection of the core or a core layer of any of the Callaway Golf Accused Products or any other golf ball, including who performed the testing, who ordered

the testing, when the testing was done, how the balls that were tested were procured and stored, the protocol that was followed, and the equipment used.

52. Acushnet's efforts to generate, measure, calculate, and/or determine the moment of inertia of any of the Callaway Golf Accused Products or any other golf ball, including who performed the testing, who ordered the testing, when the testing was done, how the balls that were tested were procured and stored, the protocol that was followed, and the equipment used.

53. Acushnet's efforts to generate, measure, calculate, and/or determine the Shore D hardness and/or Shore C hardness of the relevant layers of any of the Callaway Golf Accused Products or any other golf ball, including who performed the testing, who ordered the testing, when the testing was done, how the balls that were tested were procured and stored, the protocol that was followed, and the equipment used.

54. Acushnet's efforts to generate, measure, calculate, and/or determine the specific gravity of all core layers of any of the Callaway Golf Accused Products or any other golf ball.

55. Acushnet's efforts to generate, measure, calculate, and/or determine the moisture vapor transmission rate of any the relevant layers of the Callaway Golf Accused Products, including who performed the testing, who ordered the testing, when the testing was done, how the balls that were tested were procured and stored, the protocol that was followed, and the equipment used.

56. Acushnet's efforts to generate, measure, calculate, and/or determine the curing temperature or curing time of any layer of the Callaway Golf Accused Products or any other golf ball.

57. Acushnet's efforts to generate, measure, calculate, and/or determine the amount of crosslinking and/or the rigidity of any layer of the Callaway Golf Accused Products or any other golf ball, or of the material used to create such layers

10

at any stage during the manufacturing process, including who performed the testing, who ordered the testing, when the testing was done, how the materials that were tested were procured and stored, the protocol that was followed, and the equipment used.

58. Acushnet's manufacturing processes, specifications, guidelines and procedures for any dual core golf ball.

59. Acushnet's efforts to generate, measure, calculate, and/or determine the properties relevant to Acushnet's asserted claims of any golf ball referenced in Callaway Golf's invalidity contentions.

60. Acushnet's responses to each of Callaway Golf's interrogatories including any investigation performed by Acushnet for purposes of responding to Callaway Golf's interrogatories.

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2010, I served **PLAINTIFF CALLAWAY GOLF COMPANY'S NOTICE OF DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6) TO ACUSHNET COMPANY** on opposing counsel at the following addresses in the following manner:

**BY EMAIL AND BY HAND**

Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE  19899
rhorwitz@potteranderson.com
dmoore@potteranderson.com

**BY EMAIL**

Brian A. Rosenthal
Howrey LLP - DC
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
donnellyk@howrey.com
rosenthalb@howrey.com

**BY EMAIL**

Henry C. Bunsow
Howrey LLP
525 Market Street
Suite 3600
San Francisco, CA  94105
bunsowh@howrey.com

*/s/ Thomas L. Halkowski*
Thomas L. Halkowski

1